IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

| | | |
|---|---|---|
| ROGER GORDON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:13cv113–HEH |
| | ) | |
| RICHMOND PUBLIC SCHOOLS, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**
(Granting Motion to Dismiss)

In December 2012, Roger Gordon ("Gordon") was terminated from his employment as an electrical utilities worker for the City of Richmond School Board (the "School Board").[1] The stated reason for his termination was that Gordon had allegedly threated four co-workers. Gordon alleges that this reason was mere pretext. Instead, he asserts that his termination was the result of discrimination on the basis of race, color, and national origin. For this and other reasons, Gordon initiated this lawsuit against the School Board, its members, its Superintendent, and several of his co-workers. Defendants now move to dismiss the case based on a lack of subject matter jurisdiction and for failure to state a claim. The matter has been fully briefed and is now ripe for

---

[1] As Defendants note, the School Board is not named as a defendant. Instead, Gordon has named the "Richmond Public Schools" and the "Richmond Public School Board," neither of which is an existing entity. For sake of analysis, however, the Court construes the First Amended Complaint to bring claims against the School Board, because Gordon has named every School Board member as defendants sued in their official capacity.

decision. The Court dispenses with oral argument, finding that oral argument will not aid in the decisional process. For the reasons that follow, the Motion to Dismiss was granted by Order entered July 26, 2013, and this case was dismissed without prejudice.

## I. BACKGROUND

As required by Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court assumes Gordon's well-pleaded allegations to be true, and views all facts in the light most favorable to him.[2] *T.G. Slater & Son v. Donald P. & Patricia A. Brennan, LLC*, 385 F.3d 836, 841 (4th Cir. 2004) (citing *Mylan Labs, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)). Viewed according to these standards, the facts are construed as follows for purposes of resolving the Motions to Dismiss.[3]

---

[2] In no fewer than 233 paragraphs, the factual allegations are essentially a scattershot of various complaints about Gordon's employment. Many of Gordon's allegations are repeated several times in his First Amended Complaint and presented in an illogical order. In this way, his pleading is generally difficult to follow, despite having been drafted by counsel. While not necessarily a basis for dismissal, such pleading is generally inconsistent with Rule 8(a)(2)'s admonition that pleadings provide "a short and plain statement." *See, e.g., Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998) (Easterbrook, J.) ("Prolixity is the bane of the legal profession but a poor ground for rejecting potentially meritorious claims."). Thus, "[f]at can be ignored, confusion or ambiguity dealt with by means other than dismissal." *Id.* To that end, the Court has done its best to distill the relevant facts from Gordon's allegations, despite the awkward manner in which the facts are set forth.

[3] Defendants cast one of their arguments as a jurisdictional challenge based on Gordon's failure to exhaust administrative remedies. A challenge to this Court's subject matter jurisdiction is governed by a slightly different standard of review, allowing the Court to broadly consider evidence beyond the pleadings. *Piney Run Pres. Ass'n v. County Comm'rs*, 523 F.3d 453, 459 n.6 (4th Cir. 2008) (citation omitted). The Exhaustion requirement, however, is not jurisdictional, and so the Court applies only the Rule 12(b)(6) standard. *Edelman v. Lynchburg Coll.*, 300 F.3d 400, 403-04 (4th Cir. 2002). Nevertheless, the Court may consider extraneous evidence concerning the exhaustion of administrative remedies—namely, the Equal Employment Opportunity Commission Charge ("EEOC Charge") filed by Gordon—because he relies upon that

2

Gordon, an African-American and Jamaican individual, has worked as an electrical technician in the City of Richmond's public schools for a number of years, allegedly under hostile conditions. (Am. Compl. at ¶ 13.) In this role, he was employed by the School Board. In March 2010, he was reprimanded for visiting his daughter during school hours, despite a court order specifically granting him visitation rights during school hours. (Am. Compl. at ¶¶ 2-6.) Ultimately, Gordon's superiors dropped the reprimand on that basis, but it was never removed from his personnel file as agreed. (*Id.* at ¶ 7.) There is no allegation of any further action taken against Gordon based on that incident, or that any other employee was treated differently under similar circumstances.

During formal evaluations conducted between 2010 and 2012, Gordon's supervisors raised concerns that he sometimes arrived late to work, though Gordon identifies no employment action taken against him as a result. (*Id.* at ¶ 9.) From 2010 forward, Gordon began reporting to work at 6:00 a.m. to avoid being late. (*Id.* at ¶ 10.) He also started to track the tardiness of white employees, who were never reprimanded in his presence for their tardiness. (*Id.* at ¶¶ 10-11.) Gordon does not allege whether or not any supervisors ever raised concerns about tardiness during the white employees' evaluations.

In the summer of 2011, Gordon reported to his supervisors that another employee improperly conducted electrical work resulting in an exposed wire. (*Id.* at ¶ 12.) Soon

---

document in his First Amended Complaint at Paragraph 73. *Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33-34 (4th Cir. 2001) (citations omitted).

thereafter, he began to find screws placed near the tires of his car. Given the circumstances, he believed that white co-workers had placed the screws near his tires in retaliation for reporting the exposed wire. (*Id.* at ¶ 14.) Although Gordon alleged that this retaliation was partially motivated by race, his employers refused to believe it. (*Id.* at ¶¶ 15-16.) He went so far as to ask his supervisor, "what do I need to do stand and watch my car and take pictures?" (*Id.* at ¶ 16.) Eventually, on one occasion in March 2012, Gordon found his car with a flat tire from a screw. (*Id.* at ¶¶ 17-18.) After accusing his co-workers of harassing him by causing his flat tire, his supervisor told him to stop making "false accusations." (*Id.* at ¶ 19.) His co-workers and supervisors generally ignored his complaints, so he filed a police report alleging a hate crime. (*Id.* at ¶¶ 20-24.)

Allegedly in retaliation for his complaints, Gordon's supervisor initiated an investigation based on a co-worker's claim that Gordon had threatened him. (*Id.* at ¶ 26.) Specifically, a co-worker alleged that Gordon threatened "to watch his truck with binoculars and either shoot or stab the one" who was placing screws near his tires. (*Id.* at ¶ 27.) On a subsequent occasion, another co-worker alleged that Gordon threatened him by recounting a previous incident in which a co-worker stole Gordon's bag, so Gordon "cho[]ked him, and If [sic] someone messes with him, he would cut there [sic] tongue out." (*Id.* at ¶¶ 31, 33.) In part, Gordon denies that he threatened his co-workers, but he also indicates that the subject threats were taken out of context. (*Id.* at ¶¶ 30, 32.)

Based on these alleged threats, Gordon was suspended with pay while the School Board investigated the situation. (*Id.* at ¶¶ 36-50.) The School Board did not conduct any investigation of Gordon's complaints, instead focusing solely on his alleged threats

4

against a specific set of co-workers. (*Id.* at ¶ 36.) In the context of this investigation, Gordon again asserts that he did not make the threats and that any purported threat was taken out of context. (*Id.* at ¶¶ 39-40.) Alternatively, he characterizes any such threat as "a hypothetical statement at best." (*Id.* at ¶ 40.) Based in part on the investigator's allegations that Gordon became aggressive towards her during an interview, Gordon alleges that the investigation was improperly conducted. (*Id.* at ¶¶ 45-48.)

On December 11 and 12, 2012, an administrative hearing was held to decide the outcome of the investigation. (*Id.* at ¶ 51.) Only Gordon's white co-workers, his counselor, and the investigator testified, and Gordon was allowed to speak in his own defense. (*Id.* at ¶¶ 51-54.) In his defense, Gordon claimed whistleblower status based on his allegations that a co-worker left an exposed wire after performing shoddy electrical work at a school. (*Id.* at ¶ 53.) He also alleged that one of his co-workers was performing electrical work without the required license. (*Id.* at ¶ 54.) Finally, he took umbrage with his supervisor's failure to investigate his previous claims of harassment by co-workers. (*Id.* at ¶¶ 55-61.) By a 2 to 1 vote, the hearing panel recommended that Gordon's employment be terminated. (*Id.* at ¶ 62.)

Before the School Board could act on the panel's recommendation, four of Gordon's co-workers—each of whom had been witnesses against him—were caught stealing materials from schools to sell to local vendors. (*Id.* at ¶ 63.) Despite raising this point and his previous defenses with the School Board, the Board members accepted the administrative panel's recommendation and terminated his employment. (*Id.* at ¶ 66.)

5

Gordon alleges that the stated reason—threats against co-workers—was "pretext to conceal race discrimination and retaliation." (*Id.*)

In response to these events, Gordon filed an EEOC Charge alleging that the School Board had terminated his employment based on his race. (*Id.* at ¶¶ 72-73.)[4] After receiving a "right to sue letter," Gordon brought this action against the School Board, each of its members individually and in their official capacity, the school superintendent, his supervisors, and several of his co-workers. He asserts fourteen separate counts based on discriminatory termination (Counts I, II, and IV) and retaliation (Counts III and V) in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e through 2000e-17 ("Title VII"), and 42 U.S.C. § 1981, as well as various state law claims (Counts VI, VII, VIII, IX, X, XI, XII, XIII, and XIV). Defendants collectively move to dismiss all claims against them pursuant to Fed. R. Civ. P. 12(b)(6).

## II. STANDARD OF REVIEW

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citation omitted). The Federal Rules of Civil Procedure "require[] only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon

---

[4] The Court ends its rendition of the factual allegations at Paragraph 73, despite a total of 233 paragraphs contained in the First Amended Complaint. While there are more Paragraphs, there are no additional substantive allegations. In large part, Plaintiff simply repeats the same allegations again and again, so it is unnecessary for the Court to delve further into the pleading to recite the pertinent facts.

6

which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A complaint need not assert "detailed factual allegations," but must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (citations omitted). Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.* (citation omitted), to one that is "plausible on its face," *id.* at 570, rather than merely "conceivable." *Id.* In considering such a motion, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. *T.G. Slater*, 385 F.3d at 841 (citation omitted). Legal conclusions enjoy no such deference. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

As a general proposition, "[p]leadings must be construed to do justice." Fed. R. Civ. P. 8(d). At the same time, courts recognize that a plaintiff "can plead himself out of court by pleading facts that show that he has no legal claim." *Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011) (Posner, J.) (citing *Hecker v. Deere & Co.*, 556 F.3d 575, 588 (7th Cir. 2009); *Tamayo v. Blagojevich*, 526 F.3d 1074, 1086 (7th Cir. 2008); *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 777 (7th Cir. 2007); *Orthmann v. Apple River Campground*, 757 F.2d 909, 915 (7th Cir. 1985); and *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006)).

### III. DISCUSSION

Defendants seek dismissal on three fronts. First, they seek to confine the field of discrimination claims to the scope of Gordon's EEOC Charge, arguing that he has not otherwise exhausted his administrative remedies. Second, they challenge the sufficiency

of the allegations with respect to each of the fourteen claims brought against them. Finally, Defendants give passing treatment to a claim of sovereign immunity, though they limit the immunity claim to the state causes of action raised in the First Amended Complaint. The Court begins its analysis with the permissible scope of Title VII claims based on Gordon's exhaustion of administrative remedies.

## A. Exhaustion of Administrative Remedies

Defendants challenge whether Gordon has exhausted his administrative remedies with respect to some, but not all of the Title VII claims asserted. They raise two concerns about the scope of the EEOC Charge. First, they note that the EEOC Charge identified only "Richmond Public Schools"—essentially the School Board— as the discriminating employer. *See Alvarado v. Board of Trustees*, 848 F.2d 457, 458-60 (4th Cir. 1988) (permitting claim to proceed against board that governs school even though school was improperly identified in EEOC Charge). Also, Defendants urge the Court to dismiss any Title VII claim that goes beyond "race" discrimination to include nationality or color discrimination, as only race is mentioned in the EEOC Charge. Defendants are only partially correct on this issue.

Before filing suit, a Title VII plaintiff must file an administrative charge with the EEOC. *Chacko v. Patuxent Institution*, 429 F.3d 505, 506 (4th Cir. 2005). The charge "frames the scope of future litigation," and "'[o]nly those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit.'" *Id.* (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954,

8

963 (4th Cir. 1996)). "[T]he scope of a Title VII lawsuit may extend to any kind of discrimination like or related to allegations contained in the charge and growing out of such allegations during the pendency of the case before the Commission." *Hill v. Western Electric Co.*, 672 F.2d 381, 390 n.6 (4th Cir. 1982) (citations and internal quotation marks omitted).

Consequently, Gordon is not strictly limited to those discrimination claims expressly "stated in the initial charge," *Evans*, 80 F.3d at 963, but also claims that "can be expected to follow from a reasonable administrative investigation" may be advanced in a "subsequent civil suit." *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247-48 (4th Cir. 2000). As this Court has previously recognized, there is potential overlap between discrimination based upon race, nationality, and color. *Nieves v. CCC Transp., LLC*, No. 3:12cv500, 2012 U.S. Dist. LEXIS 127060, at *11 (E.D. Va. Sept. 6, 2012). Construing Gordon's allegations in his favor, as is required at this stage of the proceedings, his references to his Jamaican heritage and the dreadlock style in which he wears his hair suggests considerable overlap among claims of racial, national origin, or color-based discrimination. (Am. Compl. at 13.) Thus, those claims are all "reasonably related" to his claim of racial discrimination as asserted in the EEOC Charge. *Chacko*, 429 F.3d at 506.

The same is not true with respect to Gordon's addition of Defendants not specifically targeted by his EEOC Charge. Title VII specifically precludes a plaintiff from bringing a lawsuit against any defendant not named as a respondent in an EEOC charge. 42 U.S.C. §2000e-5(f)(1); *see also Onan v. County of Roanoke*, No. 94-1770,

9

1995 U.S. App. LEXIS 9085, at *9 (4th Cir. Apr. 21, 1995). Accordingly, to the extent that Gordon asserts a Title VII claim against any Defendant other than the School Board, such claim are dismissed for failure to exhaust administrative remedies.[5]

## B. Sufficiency of the Claims

Gordon's claims fall into three different categories for purposes of the Court's analysis: (1) federal discrimination claims; (2) federal retaliation claims; and, (3) state law claims. The Court will address each category in turn.[6]

### 1. Discrimination Claims (Counts I, II, IV)

In Counts I, II, and IV, Gordon asserts three separate counts alleging that he was fired on account of his race, color, and nationality. (Am. Compl. at ¶¶ 138-151, 156-165.) In part, Count II also incorporates allegations of racial bias based on the manner in which the School Board conducted its investigation and failed to conduct a proper investigation about Gordon's complaints. (*Id.* at ¶ 147.) Count IV relies on 42 U.S.C. § 1981. Based on the context of the allegations, the Court presumes that Counts I and II are brought under Title VII, even though Title VII is not identified therein. The distinction is of no consequence, however, because both Title VII and Section 1981 impose identical requirements to establish race discrimination claims. *Love-Lane v. Martin*, 355 F.3d 766, 786 (4th Cir. 2004).

---

[5] Regardless of the extent to which Gordon has exhausted his administrative remedies, all claims would be dismissed against all Defendants for the reasons set forth *infra* at Section III(B).

[6] Defendants also make the argument that the official capacity claims against any of the officials is redundant, because any such suit is just a vehicle to bring suit against the School Board. While they may be correct, the Court need not reach this issue because it does not affect the Court's analysis or final disposition of the case.

To prevail on a claim of race discrimination, a plaintiff may either follow the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), or offer direct evidence of race discrimination. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511-12 (2002); *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010) (citing *Swierkiewicz*, 534 U.S. at 510-15). Because he is not obligated to follow the *McDonnell Douglas* burden-shifting approach, he may plead his case simply by alleging that "he had been terminated on account of his [race]" and by "detail[ing] the events leading to his termination, provid[ing] relevant dates, and include[ing] the [races] of at least some of the relevant persons involved with his termination." *Swierkiewicz*, 534 U.S. at 514. At a minimum, a plaintiff must allege facts showing that he was "discharge[d] ... because of [his] race." *Coleman*, 626 F.3d at 190 (citing 42 U.S.C. § 2000e-2). But in doing so, the facts must "plausibly" support allegations of discrimination, and cannot rely on mere "conclusory" allegations. *Id.* at 190-91.

Alternatively, a plaintiff may allege the elements of a *prima facie* case, which are: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class. *Id.* (citing *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004).

Under either rubric, Gordon's allegations fail to state a claim. Gordon alleges that he was terminated when the School Board accepted an administrative panel's finding that he had threatened bodily harm against his co-workers. (Am. Compl. at ¶¶ 51, 62-66.) He also includes a list of several complaints about his working conditions, ranging from his

11

employer's failure to accommodate visitation rights at school to the School Board's failure to adequately investigate the screws placed around his tires. (*Id.* at ¶¶ 2-7, 14-16.) In conclusory fashion only, Gordon associates these circumstances with race, color, and national origin discrimination. (*See, e.g., Id.* at ¶ 13.) There is absolutely no allegation that the administrative panel or the School Board was motivated by race, color, or nationality when deciding to terminate Gordon's employment. To the contrary, Gordon admits that he made some sort of threatening statement, though he characterizes those statements as taken out of context or "hypothetical at best." (*Id.* at ¶¶ 39-40.) By admitting that the School Board's reason for termination is at least partially true, while failing to allege facts indicative of discriminatory motives by the School Board, Gordon essentially pleads himself out of court. *Atkins*, 631 F.3d at 832. He offers only conclusory allegations to transform the School Board's decision into mere pretext. (*Id.* at ¶ 66.)

The closest that Gordon comes to alleging any racially-motivated employment action is his allegation that he was verbally reprimanded for arriving late to work when white employees were not—two years before his termination. (*Id.* at ¶ 9.) After his reprimand, Gordon noticed that white employees were often late to work, but he never saw them reprimanded. (*Id.* at ¶ 11.) There are two problems with this allegation. First, Gordon admits that he was verbally reprimanded in the context of his evaluation. (*Id.* at ¶ 9.) Because he does not make any allegations with respect to how white employees were treated *in their evaluations*, it is conclusory to say that they were treated differently under similar circumstances. Even so, Gordon's termination several years later appears from

12

the allegations to be completely unrelated. Gordon does not allege that he ever suffered any adverse employment action as a result of his alleged tardiness, so these allegations have nothing to do with his eventual termination.

Also in conclusory fashion, Gordon alleges that he "was treated unfavorably by his co-workers and the supervisor Robert Tribble thus making his working conditions a hostile work environment." (*Id.* at ¶ 13.) "Unlike other, more direct and discrete unlawful employment practices, hostile work environments generally result only after an accumulation of discrete instances of harassment." *Jordan v. Alternative Res. Corp.*, 458 F.3d 332, 339 (4th Cir. 2006) (citing *Nat'l R.R.. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002); *Spriggs v. Diamond Auto Glass*, 2442 F.3d 179, 184 (4th Cir. 2001)). "[S]imple teasing, off-hand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* (citations and internal quotation marks omitted). At best, Gordon alleges two discrete, potentially hostile circumstances with no apparent connection to his race, color, or nationality. Because Gordon has failed to allege an "accumulation" of racially-charged acts, any claim of a hostile work environment has not been sufficiently alleged.[7]

---

[7] Given the manner in which he pleads his case, it is also difficult to decipher which allegations are against co-workers and which are against supervisors. To the extent that a hostile work environment claim is brought against the School Board based on co-workers' misconduct, such a claim would also fail because Gordon has failed to allege negligent control of working conditions. *Vance v. Ball State Univ.*, 570 U.S. ___, 133 S. Ct. 2434, 576 (2013). If the racial hostility derives from supervisors, the employer is strictly liable, but only if the hostile work environment leads to a "tangible employment action." *Id.* Even if Gordon's allegations of racially hostile conduct rose to an actionable level, it would remain unclear whether Gordon alleges that the actions were

Finally, were Gordon to rely on the *McDonnell Douglas* burden-shifting framework to plead a *prima facie* case of discrimination, his allegations would still fall short. There is no dispute here that Gordon is a member of a protected class and that he suffered an adverse employment action when fired. *See Coleman*, 626 F.3d at 190-91 (listing elements). But the other two elements are lacking—that he was meeting performance expectations and that similarly situated employees were treated differently. *Id.* There are simply no allegations concerning similarly situated employees investigated for making threats against their co-workers. And, with respect to his performance, his only allegation is a conclusory statement that he "was performing satisfactorily at the time of the adverse employment action." (*Id.* at ¶ 141.) This allegation simply recites an element of a *prima facie* case, which is insufficient. *Twombly*, 550 U.S. at 555 (citations omitted).

In sum, Gordon fails to allege sufficient facts to raise a claim that his termination was the result of unlawful discrimination, regardless of whether he proceeds under *McDonnell Douglas* or a theory of direct discrimination. Accordingly, Counts I, II, and IV are dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

2. **Retaliation Claims (Counts III, V)**

Gordon brings claims for retaliation under Title VII and 42 U.S.C. § 1981. Those claims are dismissed because Gordon fails to allege any causal nexus between any protected activity and his termination. Regardless of whether asserted under Title VII or

---

those of co-workers, those of a supervisor, or whether the School Board was negligent in its response.

14

Section 1981, the elements of a retaliation claim are: (1) engagement in a protected activity; (2) adverse employment action; and, (3) a causal link between the two. *Coleman*, 626 F.3d at 190. Essentially, the causal connection turns on whether the adverse employment action would have occurred "but for" the protected activity. *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985), overruled on other grounds by *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).

As the Court has already explained, *supra* at Section III(B)(1), Gordon has failed to plausibly allege any cause of his termination other than the School Board's adoption of findings issued by an administrative panel—namely, that Gordon should be fired for threatening his co-workers. (Am. Compl. at ¶ 66.) His allegations that this decision was based on anything else are entirely conclusory. Indeed, Gordon has not alleged that either the administrative panel or the School Board even knew about any alleged discrimination or protected activity taken in response. Accordingly, the retaliation claims are dismissed.

3.  **State Law Claims (Counts VI, VII, VIII, IX, X, XI, XII, XIII, XIV)**

In addition to his federal employment and civil rights claims, Gordon asserts nine state law claims arising under Virginia law. Having dismissed Gordon's federal claims, the Court has discretion to decide whether to exercise supplemental jurisdiction over the remaining state law claims. *Kendall v. City of Chesapeake*, 174 F.3d 437, 444 (4th Cir. 1999). Finding that these claims should be addressed in Virginia's state courts, this Court

15

declines to exercise supplemental jurisdiction over them. Accordingly, Gordon's state claims are dismissed without prejudice.[8]

## IV. CONCLUSION

In sum, the Court finds that Gordon has failed to state a claim for unlawful discrimination or retaliation. Finding it appropriate to dismiss the federal claims, the Court declines to exercise supplemental jurisdiction over Gordon's state law claims. Accordingly, Defendants' Motion to Dismiss is granted and the case is dismissed without prejudice.

This Memorandum Opinion accompanies the Court's Order granting Defendants' Motion to Dismiss, entered on July 26, 2013.

/s/
Henry E. Hudson
United States District Judge

Date: July 30, 2013
Richmond, Virginia

---

[8] Because the Court declines to exercise supplemental jurisdiction over Gordon's state law claims, it offers no opinion about the viability of sovereign immunity defenses raised in response thereto.

16